No. 43,702

Ruby LaVerne Rankin, *Appellant*, v. United Commercial Travelers of America, *Appellee.*

(392 P. 2d 894)

Opinion filed June 6, 1964.

*W. Luke Chapin,* of Medicine Lodge, argued the cause, and appeared on the briefs for the appellant.

*W. A. Kahrs,* of Wichita, argued the cause, and *Riley W. MacGregor* and *John W. MacGregor,* both of Medicine Lodge, *Robert H. Nelson, H. W. Fanning, Richard C. Hite,* and *Darrell D. Kellogg,* all of Wichita, were with him on the briefs for the appellee.

The opinion of the court was delivered by

Hatcher, C.: This is an appeal from a judgment holding that death from a heart attack while fighting a pasture fire was not an accidental death within the meaning of an accidental death certificate issued by a fraternal benefit society.

At a pretrial conference the above issue was presented to the trial court on the statement of counsel for the defendant that he would, for the purpose of having the issue determined, admit all facts alleged in the petition and also all facts contended for by the plaintiff at the pretrial conference. It is necessary, therefore, that the facts which were alleged in the petition, in detail, be presented. We quote in part, omitting introductory allegations:

"That on the 26th day of November, 1941, in consideration of the payment of Eugene O. Rankin, deceased husband of this plaintiff, to defendant of a

premium as determined by defendant, defendant made and delivered to Eugene O. Rankin its insurance certificate in writing, upon the life of Eugene O. Rankin, a copy of which is annexed to this petition, marked 'Exhibit A,' and by reference is made a part hereof; and defendant thereby insured the life of Eugene O. Rankin, in the sum of $5,000.00 against loss of life by accidental means.

"That this plaintiff, Ruby LaVerne Rankin, is the beneficiary under such insurance certificate.

"That thereafter and on March 18, 1962, while said insurance certificate was in full force, all premiums due having been paid thereon, Eugene O. Rankin, died, his death having occurred as a result of accident, as hereinafter set forth.

"That on the 18th day of March, 1962, which was a Sunday, Eugene O. Rankin, age 54, was in good health, having been attending to all of his duties as a farmer and livestock man, and doing most of his own work in these activities, and not having had any cause or reason to see a doctor during the five years prior thereto, except for a hernia repair made in 1958, insurance examinations and a cold in February, 1962; at about 3:00 p. m. on that date, after having had Sunday dinner and visiting with his son and family, the son, Larry Rankin, having just returned from military service, Eugene O. Rankin received a telephone call informing him that there was a large pasture fire in the Hawkins pasture just south of the Rankin pasture where his cattle were being kept; Eugene and Larry both immediately changed their clothes, got some gunny sacks, wire and pliers, got in Eugene's car, Eugene driving, and left for the scene of the fire, which was about five to six miles northeast of Sharon, Kansas, and a little over twenty miles from Kiowa, Kansas, where the Rankins lived; they drove to and entered the Rankin pasture and could see a huge pasture fire in the pasture adjoining the Rankin pasture on the south; they could see that the Rankin cattle were toward the south end of the Rankin pasture, so immediately drove down toward the cattle, Eugene called the cattle and attempted to get them to follow the car, but they would not do so, so Larry got out and hazed the cattle toward a corral in the north end of the pasture while Gene drove the car and called the cattle to follow it; at the north end of the pasture there was a gate leading into an enclosure near a tree belt; Gene got out of the car and he and Larry both herded and drove the cattle, on foot, about 70 head of two year old heifers, some with calves, through the gate; they then herded the cattle in the same manner toward a corral which was east of the first mentioned gate; as they reached the corral gate, Gene got out of the car, and he and Larry herded and drove the cattle through the corral gate and shut the gate; Gene then continued driving east, Larry with him, into what is known as the big Rankin pasture, then they drove to the south end of the pasture, where they could see the huge pasture fire, about a quarter of a mile to half a mile away, traveling northwest and burning on a northeast-southwest angle; they could see men fighting the fire with gunny sacks and spray pumps; at about that time, a group of men in a pickup truck drove away from the fire and toward a windmill in the Stone pasture adjacent to the Rankin pasture on the east; Larry left Gene and walked or ran over to the men in the pickup and went with them to fight the fire; Gene drove back to the north, apparently to get to a gate where he could get into the pasture where the pickup was; this probably was at about 4:30 p. m.; Larry

and the other men continued fighting the fire until it was about dark and the fire was about out; this was about 6:30 p. m.; they went to the Don Rankin farm house, near Nashville, thinking Gene would be there; the men fighting the fire had been spread out over a large area of more than a mile, and no one had seen Gene; when he did not return, they commenced to hunt for him; they did not find him for about four or five hours; when they found him, he was dead, lying in part of the burned out area in the Hawkins pasture, with a wet gunny sack in his hand; his car was parked in the Stone pasture adjoining on the north, about one-fourth mile away; he had undergone extreme mental emotion and physical exertion and stress in fighting the pasture fire and events connected therewith, from which over exertion and as a result of the unusual and unexpected pasture fire; he suffered heart failure and death."

The defendant in its answer demurred to the petition for the reason that it failed to state facts sufficient to constitute a cause of action, admitted the general allegations of the petition for all practical purposes and further alleged:

"It is admitted that Eugene O. Rankin died on or about March 18, 1962. It is expressly denied that his death occurred as a result of accident or that his death occurred under such circumstances as to bring it within the insurance coverage provided by defendant's certificate of insurance and by-laws.

"As an alternative and separate defense it is alleged that if Eugene O. Rankin's death was in any degree caused by accident, natural and non-accidental causes contributed to his death."

The reply was a general denial.

After the issues were joined the case was set for a pretrial conference. It was there agreed by counsel for defendant that all of the facts stated by counsel for plaintiff would be admitted in addition to the facts alleged in the petition for the purpose of determining the question of law in advance of the trial. We have, therefore, searched the record for the purpose of determining what statements of fact were made at the pretrial conference which were not covered by the allegations of the petition.

Counsel for plaintiff stated in connection with the general nature of the terrain:

". . . I might comment at this point that this land in here (indicating) is rough pasture land with the exception of a few little portions or crop land that are indicated there. They are a little smoother but the pasture land is rough; hills and deep valley. . . ."

Counsel for plaintiff stated his contention as to the cause of the heart attack:

"We are not maintaining that any other injury was involved. We do maintain that the heart attack was precipitated by the unusual activity of Eugene Rankin on that date, both physical and mental, and that this huge pasture fire

so close to his cattle was an unusual event, a very unusual event. He was under continuous nervous and mental strain in seeing the fire and herding the cattle up to the corral and that was followed by extreme physical exertion that goes along with fighting a fire and putting out part of the fire and perhaps flaming fence posts with a gunny sack, and that, we say, precipitated a heart attack and death."

Counsel for defendant introduced the constitution and by-laws of the defendant as exhibits with the consent of plaintiff. Counsel for defendant stated in connection therewith:

". . . Referring to the 1961 edition at page 59, it's Article XI, Section 13, of the 1961 Constitution and By-Laws, there is a statement as to the insurance provided by this fraternal benefit society which states in part as follows: "'Class A Insured Members shall be indemnified in accordance with the terms hereinafter set out in this Article, against the results of bodily injury hereinafter mentioned, effected solely through external, violent and accidental means, herein termed the accident, which shall be occasioned by the said accident, alone and independent of all other causes.'

"This in effect is a definition of an accident insofar as the United Commercial Travelers insurance is concerned."

The admissions as to medical testimony are disclosed by the following colloquy between counsel:

"Mr. Chapin: You'd admit for the purpose of this motion that medical testimony would state that mental emotional strain, physical exertion, particularly extreme physical exertion can and does precipitate heart attacks and event death?

"Mr. Hite: For the purpose of this motion we would so admit.

"Mr. Chapin: All right."

The case was submitted to the trial court as a question of law to be determined on the facts as admitted.

After careful consideration and following a well written and helpful memorandum opinion, the trial judge concluded that the defendant's motion for judgment on the pleadings, stipulations and admissions should be sustained. Judgment was entered accordingly and plaintiff has appealed.

It would perhaps be helpful to all interested if we, before proceeding with the discussion, attempt to consolidate into one brief statement the issues of fact and issues of law which present the question for determination.

Where an able-bodied man, 54 years of age, without apparent physical or health impairment, dies of a heart attack caused exclusively from emotional strain, heat and physical exertion while engaged in fighting a large pasture fire, is the death the result of

bodily injury effected solely through external, violent and accidental means, independent of all other causes?

It is agreed by the parties that the defendant which issued the accident indemnity insurance certificate was a fraternal benefit society with its home office in the state of Ohio, and that the answer to the controversy should be determined by the decisions of the Supreme Court of Ohio.

Unfortunately the determination of the question based on the decisions of the Ohio Supreme Court presents a complicated problem. The court's decisions after its latest pronouncement do not appear to be in complete harmony. It would appear that the court is divided four to three on just what its decisions on the particular question do mean.

The first case from Ohio which touched directly on the question was *Casualty Co. v. Johnson*, 91 Ohio St. 155, 156, 110 N. E. 475. The appellee relies chiefly on this case and it was given considerable consideration by the lower court in making its determination. In its opinion the court stated the undisputed facts as follows:

"The insured was a well and active man. He had no organic trouble with his heart. He was accustomed to take cold plunges, when heated and after exercising and horseback riding, without any apparent trouble. The cold plunge caused the heart dilation. The dilation of the heart from taking the cold plunge was an unusual result and one not reasonably to have been expected."

It was held in the syllabus:

"Where an insured holding an accident policy indemnifying him against bodily injuries which independently of all other causes are effected solely and exclusively by *external, violent* and *accidental* means, suffers an injury due to the dilation of the heart following the voluntary taking of a cold-water bath, it will not be considered as the result of an accident where under the circumstances attending the dilation, there is no evidence that anything occurred which the insured had not planned or anticipated, excepting the dilation and its consequences."

We must agree, as argued by appellee, that the Johnson case was decided on the distinction made between "accidental means" and "accidental results" and if followed would require the affirmance of the case now before us for consideration.

The Johnson case was decided in 1914. In 1940, the Ohio Supreme Court decided the case of *Mitchell v. N. Y. L. Ins. Co.*, 136 Ohio St. 551, 27 N. E. 2d 243. It was held:

"Where no unexpected, unforeseen or unusual happening intervenes, and an insured dies as the result of a ruptured sigmoid, caused by administering

to himself an enema in the manner intended, by voluntarily connecting the rubber tube to the faucets in a bathtub, such death will not be deemed effected by accidental means within the intent and meaning of a life insurance policy, which agrees to pay double indemnity if the death of the insured 'resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental means.'" (Syl.)

We quote from the opinion at some length because what is there said is diametrically opposite to the conclusion reached in the next decision to be considered. On page 554 of the opinion the court, quoting from *Rock v. Travelers' Insurance Co.*, 172 Cal. 462, 156 Pac. 1029, stated:

"'. . . A differentiation is made, therefore, between the result to the insured and the means which is the operative cause in producing this result. It is not enough that death or injury should be unexpected or unforeseen, but there must be some element of unexpectedness in the preceding act or occurrence which leads to the injury or death. Policies like the one before us have been before the courts in many cases, and the great weight of authority we think, sustains the view which we have just expressed.'"

The opinion continued:

"In the case of *Landress v. Phoenix Mutual Life Ins. Co.*, 291 U. S., 491, 78 L. Ed., 934, 54 S. Ct., 461, the Supreme Court of the United States had before it the interpretation of the same words that are involved in this case. The insured in that case suffered sun stroke while playing golf, and the question was presented whether this was an injury inflicted by accidental means.

"The court held in that case that while the result was accidental, the means was not. In the opinion of the case, on page 495, the following words appear:

"'Petitioner argues that the death, resulting from voluntary exposure to the sun's rays under normal conditions, was accidental in the common or popular sense of the term and should therefore be held to be within the liability clauses of the policies. But it is not enough, to establish liability under these clauses, that the death or injury was accidental in the understanding of the average man—that the result of the exposure "was something unforeseen, unsuspected, extraordinary, an unlooked for mishap, and so an accident," . . .'"

It will be noted that in *Landress v. Phoenix Ins. Co.*, 291 U. S. 491, 78 L. Ed. 934, 54 S. Ct. 461, 90 A. L. R. 1382, cited in the above quotation, that recovery was denied for death from a sun stroke under an insurance policy covering death by accidental means because there was no "accidental means" although there was an "accidental result." The court stated that there must be some unforeseen or unintended condition or combination of circumstances, external to the victim's body, which contributed to the accidental result. It further stated:

"This distinction between accidental external means and accidental result has been generally recognized and applied where the stipulated liability is for injury resulting from an accidental external means. . . ." (p. 497.)

Justice Cardozo warned in a dissenting opinion that an attempt to distinguish between "accidental means" and "accidental results" would plunge "this branch of the law into a Serbonian Bog."

At this point we would call special attention to the Landress case which is reported in 90 A. L. R. 1382 and an annotation follows at page 1387. The case and the annotation cite the numerous cases touching on the present controversy and they will not be repeated here.

Getting back to the Mitchell case, *supra*, the dissenting opinion approved by three of the justices is worthy of consideration because what was said was a forerunner of what was to come. It is stated at page 556:

"This dissent from the majority opinion occurs at the point of interpretation of the term 'accidental cause' or 'accidental means,' both terms being used by the courts interchangeably as having the same meaning. The confusion of thought on this subject arises, in my humble opinion, in the failure to differentiate or to recognize the distinction between the origin of injury flowing from the voluntary act of the party injured, accompanied with full knowledge and apprehension of the probable consequences of his act, and the origin of injury flowing from the voluntary act of the party injured unaccompanied by apprehension on his part of unforeseen and unexpected consequences resulting from such act. In the latter case, the event or circumstance which he failed to apprehend and which was responsible for the mishap furnishes the basis of accident by accidental means."

The above statement was, in fact, followed in the next Ohio case which was decided in 1952. In *Hammer v. Accident Assn.*, 158 Ohio St. 394, 395, 109 N. E. 2d 649, the court had under consideration a sunstroke case. The facts are stated as follows:

". . . On the day of his death the insured was approximately thirty-five years of age. He and another man employed by a roofing company were engaged in shingling the roof of a house in Greenfield, Ohio. The weather is described as 'very hot,' 'mighty hot' and 'so hot we couldn't hardly get our breath.' In the middle of the afternoon both men left the roof and rested in the shade about a half hour. Then each picked up a bundle of shingles weighing approximately 70 pounds. The men started up the ladder with the decedent in the lead. The latter threw his bundle on the roof and asked his associate whether he needed help. On receiving an answer in the negative, the decedent stepped from the ladder to the roof. It was necessary to place the shingles higher on the roof. The decedent attempted to accomplish this, but as he did so he suddenly collapsed and fell on his bundle of shingles. He died within a few minutes."

It was held:

"Heat exhaustion or sunstroke, if suffered unexpectedly, is within the protection of a life and accident policy insuring against bodily injuries sustained through accidental means.

"To warrant a recovery it is not necessary that the exposure to the sun should be the result of an accident." (Syl. 1 and 2.)

The court stated in the opinion:

"The question whether heat exhaustion or sunstroke may constitute accidental means is, counsel agree, one of first impression in this state. The general rule is summarized as follows in 29 American Jurisprudence, 759, Section 1004:

" 'It is held by the weight of authority that a sunstroke, suffered by one unexpectedly, is within the protection of an accident insurance policy insuring against bodily injuries sustained through external, violent, and accidental means. In accordance with this view, it has been held that death from a sunstroke suffered while the insured is engaged in his ordinary duties or occupation is a risk covered by the policy, and that it is unnecessary, in order to warrant a recovery, that the exposure to the sun should be the result of an accident.' " (p. 397.)

The court appears to have followed the general rule without stating the reason for it. The great weight of authority allows recovery for death from a sunstroke under an accidental death policy because it recognizes the accidental result although the instrumentality which caused the result was not necessarily accidental.

In the opinion the court attempts to distinguish its previous decisions. It said of *Casualty Co. v. Johnson,* supra:

". . . In the *Johnson case* the insured died from a heart attack following a voluntary cold bath, and in the opinion it is observed that the insured planned for and deliberately entered on the project and it was carried precisely as intended. The water was no colder than he wanted it to be. . . ." (P. 399.)

We fail to distinguish between the above situation and one where the insured deliberately enters on a project which takes him out into the rays of the sun which are no hotter than he knows them to be and dies of a heart attack from heat exhaustion.

We agree with the statement in the dissenting opinion approved by three of the justices:

"The result in this case marks a departure to some extent from the decisions in the following cases: *New Amsterdam Casualty Co. v. Johnson,* 91 Ohio St., 155, 110 N. E. 475, L. R. A. 1916B, 1018; *Mitchell v. New York Life Ins. Co.,* 136 Ohio St., 551, 27 N. E. (2d), 243; and *Burns v. Employers' Liability Assurance Corp.,* 134 Ohio St., 222, 16 N. E. (2d), 316, 117 A. L. R., 733." (P. 400.)

Thus the Ohio court in the Hammer case has adopted what is now the general law in most jurisdictions, as stated in 166 A. L. R. 473:

"In an increasing number of jurisdictions, the distinction between the term 'accidental means' and the terms 'accident,' 'accidental result,' 'accidental injury,' 'accidental death,' and the like, has been rejected or repudiated, and the terms are regarded as legally synonymous."

Regardless of any distinction which the Ohio Supreme Court may make in the future between "accidental means" and "accidental result," we are unable to make any distinction between a case in which a man dies from a heart attack caused by heat exhaustion and overexertion from the rays of the sun in which he is working, and a case in which a man dies from a heart attack caused by heat exhaustion and overexertion from the flames of a pasture fire which he is fighting. If there is any distinction the latter would come nearer being an unusual occurrence and the result of accidental means, if it is desired to distinguish between "accidental means" and "accidental result."

The court had to consider that the sunstroke in the Hammer case was, in and of itself, an accidental means, or drop its distinction between "accidental means" and "accidental cause." The decisions which hold that death from a heart attack as the result of a sunstroke, consider "accidental means" as a means or a cause that is unexpected, unforeseen, and fortuitous; it is an accidental event, unexpected and unforeseeable, an occurrence that is unexpected and unforeseen.

The Ohio Supreme Court appears to have adopted the rule that where death or injury is not the natural and probable result of a voluntary and intentional act by the insured, or something unforeseen or unexpected or unusual occurs in the act which precedes the injury, then the injury is the result of accidental means.

In cases arising under accident insurance policies, where possible negligence on the part of the assured does not affect the question of liability, the efficient cause of a sunstroke, the *vis major* which inflicts the injury, is considered to be the excessive heat, and it must, therefore, be deemed "the means" of the injury.

The general rule permitting recovery for heart attacks under circumstances such as are before us for consideration is stated in 56 A. L. R. 2d 816, with supporting citations as follows:

"There is seemingly general agreement on the proposition that if an unusual happening occurs in conjunction with exertion or exercise on the part of the

insured, and this is followed by a heart attack, recovery may (assuming causation is established) be had under a policy providing benefits for the results of 'accidental means,' whether the unusual happening precipitated the exertion or occurred in the course of the same."

We are forced to conclude that under the authority of *Hammer v. Accident Assn.,* supra, where an able bodied man, without apparent physical or health impairment, dies of a heart attack caused exclusively from emotional strain, heat and physical exertion while engaged in fighting a pasture fire, the death is the result of bodily injury effected solely through external, violent and accidental means.

The plaintiff may not be able to prove the facts alleged in the petition which brings the case within the above rule but she should have the opportunity.

It follows from what has been said that the trial court erroneously rendered judgment in favor of the defendant, as a matter of law, on the pleadings, stipulations and admissions following the pretrial conference.

The conclusion reached renders unnecessary a discussion of other alleged trial errors.

The judgment is reversed.

APPROVED BY THE COURT.